Opinion issued August 28, 2025



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00442-CR

_____

**SOSTENES LORENZO TOLENTINO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 14**
**Harris County, Texas**
**Trial Court Case No. 2306675**

---

## REVISED OPINION ON FURTHER REHEARING

This appeal from a DWI conviction presents a dispute about the due process right to a trial that the defendant can understand. Appellant Sostenes Lorenzo Tolentino has contended throughout the proceeding that he could not understand the

trial. His contention failed below, but a panel of this Court agreed with Tolentino and reversed.

The State now seeks rehearing. At the outset, we should note that everyone seems to agree on three propositions:

- A criminal defendant has a right to an interpreter so that he or she can understand the proceedings.

- When Tolentino went to trial, the court did not provide him with an interpreter in Nahuatl (his first language) but did provide him with an interpreter in Spanish.

- The correctness of that ruling depends on a key factual question, namely whether he could understand Spanish adequately.

If Tolentino could not understand Spanish adequately, the conviction cannot stand. If he could understand it adequately, his appeal should fail.

Unfortunately, Tolentino and the State disagree over this key factual question. Tolentino says that he did not understand Spanish well enough to go to trial with a Spanish-language interpreter, while the State says that he did. More precisely, the State contends that appellate courts do not decide such questions de novo, but rather leave the matter to the trial court's discretion. In the State's view, the trial court had conflicting evidence before it and permissibly exercised its discretion to provide an interpreter in Spanish rather than Nahuatl.

The dispute now comes before this Court at the motion for rehearing stage. Because the Court issued three prior opinions during 2024, this opinion will begin

with the history of the appellate proceedings and then go back to the beginning to discuss what happened below and whether the judgment of conviction should stand.

I.

The appeal was submitted without argument in October 2023 and decided in January 2024, in an opinion that reversed and remanded for a new trial, holding that the trial court abused its discretion in failing to provide Tolentino a Nahuatl interpreter. *See Tolentino v. State*, No. 01-22-00442-CR, 2024 WL 86413 (Tex. App.—Houston [1st Dist.] Jan. 9, 2024), *withdrawn* (Apr. 23, 2024) ("*Tolentino I*").

In a motion for en banc reconsideration, the State argued that the panel had departed from the proper review for abuse of discretion. Specifically, the State argued that the panel "was obliged to look at the whole record, not just the pretrial record," and at the motion for new trial hearing, "the interpreter testified that she spoke with the appellant in Spanish and he said he understood the translations."

In April 2024, the panel issued a second opinion but reached the same result. *See Tolentino v. State*, No. 01-22-00442-CR, 2024 WL 1723975 (Tex. App.—Houston [1st Dist.] Apr. 23, 2024), *withdrawn* (Dec. 31, 2024) ("*Tolentino II*"). Among other things, the second opinion discussed some additional evidence that the State contended had been overlooked. *See id.* at *3–4. The State again sought en banc reconsideration. As before, the State continued to insist that the panel departed from the deferential standard of review that governs discretionary rulings:

3

The State is requesting en banc reconsideration for two reasons. First, the standard of review the panel created conflicts with all previous cases on this subject—including five cases the panel cited but ignored. Second, the State believes that if someone else watches the ten-minute video and considers the officer's testimony about his Spanish-language conversations with the appellant, it will become apparent how wrong the panel's description of the video is.

On December 31, 2024, the panel issued a third opinion. *See Tolentino v. State*, No. 01-22-00442-CR, 2024 WL 5249165 (Tex. App.—Houston [1st Dist.] Dec. 31, 2024), *reh'g granted* (Aug. 28, 2025) ("*Tolentino III*"). It again revised the prior opinion while adhering to its ultimate holding that the law requires a new trial. The panel did this by quorum, as one Justice had left the Court to join a different court of appeals in September. Further, the remaining two Justices ended their terms of office that final day of 2024. The State moved for rehearing and for en banc reconsideration, arguing that abuse of discretion review should result in affirmance because of the conflicting state of the evidence about Tolentino's ability to understand Spanish. With all three members of the prior panel having left office, motions for rehearing and en banc reconsideration remain pending, so the Court still has plenary power over the judgment. Hence, a new panel has been constituted. It is in this irregular posture that the case now arises on rehearing.

## II.

Some excerpts from Tolentino's brief will explain the case. First, the statement of the case ably summarizes how the issue arose in the court below:

Sostenes Lorenzo Tolentino was charged with driving while intoxicated on April 6, 2020. A Harris County jury found him guilty on June 9, 2022. The same day, the trial court sentenced him to one year in the Harris County jail, suspended for 15 months of community supervision.

The trial was conducted in English, with a Spanish interpreter. Mr. Tolentino, however, speaks very little Spanish. His first language is Nahuatl, an indigenous language spoken in parts of Mexico by an estimated 1.5 million people.

Appellate counsel timely filed a motion for new trial due to the trial court's failure to provide a Nahuatl[] interpreter for Mr. Tolentino. After a hearing on August 23, 2022, the trial court denied the motion.

(Citation omitted.) Second, Tolentino presents two issues for decision on appeal:

ISSUE ONE: Mr. Tolentino sat through an entire trial he could not understand. This is unconstitutional and reversibly harmful error.

ISSUE TWO: The trial court abused its discretion when it denied a new trial for Mr. Tolentino.

Finally, in support of these issues, Tolentino's summary of the argument on appeal

frames the debate as one about what he could understand:

The trial court's failure to appoint an interpreter for trial in the language Mr. Tolentino *understands* violated the defendant's constitutional rights to confrontation, due process and due course of law, and effective assistance of counsel. His complete helplessness to *understand* the proceedings and assist his counsel cannot be said to have been harmless beyond a reasonable doubt.

The trial court's action directly violated the requirements of Tex. Code Crim. P. art 38.30: the court was aware of Mr. Tolentino's inability to *understand* English. Instead of appointing an interpreter in the language he did *understand*, however, the court appointed a Spanish-language interpreter. This violated his substantial rights, described in Issue I, and rendered the trial fundamentally unfair.

5

(Emphasis added.)

As is apparent from all these excerpts from Tolentino's brief, everything depends on a single factual premise about what Tolentino could understand. If he establishes that premise, he wins the appeal.

Both sides seem to agree on the legal analysis, even if not its application. First, constitutional due process requires that a defendant sufficiently understand the proceedings against him to be able to assist in his own defense. *Ex Parte Cockrell*, 424 S.W.3d 543, 557 (Tex. Crim. App. 2014); *see also Garcia v. State*, 149 S.W.3d 135, 140–41 (Tex. Crim. App. 2004) (stating that Confrontation Clause of Sixth Amendment protects right to be present at trial, which, in turn, "includes the right to understand the testimony of the witnesses," and Confrontation Clause requires "providing an interpreter to an accused who does not understand English"). Second, Code of Criminal Procedure Article 38.30 implements the requirements of due process by requiring an interpreter when necessary:

> When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for the person charged or the witness. Any person may be subpoenaed, attached or recognized in any criminal action or proceeding, to appear before the proper judge or court to act as interpreter therein, under the same rules and penalties as are provided for witnesses. In the event that the only available interpreter is not considered to possess adequate interpreting skills for the particular situation or the interpreter is not familiar with use of slang, the person charged or witness may be

6

permitted by the court to nominate another person to act as intermediary between the person charged or witness and the appointed interpreter during the proceedings.

Act of May 26, 2005, 79th Leg., R.S., ch. 956, § 1, art. 38.30(a), 2005 Tex. Gen. Laws 3225, 3225 (amended 2025) (current version at TEX. CODE CRIM. PROC. art. 38.30(a)). As Tolentino notes, the basic idea is that "no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment." *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir. 1973).

The leading case on the use of interpreters is *Linton v. State*, 275 S.W.3d 493 (Tex. Crim. App. 2009). Although that case involved a sign-language interpreter for the deaf under Article 38.31, it considered cases involving spoken-language translation, and later courts have applied *Linton*'s legal framework to disputes about translation under Article 38.30. *See id.* at 508 (considering cases from other jurisdictions involving spoken languages); *see, e.g.*, *West v. State*, 406 S.W.3d 748, 763 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (applying *Linton* to case involving Article 38.30 and language translation of witness testimony). "The question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Linton*, 275 S.W.3d at 500.

The next step in the analysis involves the standard of review. *Linton* addressed the appropriate standard of review in cases involving interpreters, and the Court of Criminal Appeals squarely held that appellate courts should apply an abuse of discretion standard. *See id.* at 502–03. "We agree with the many courts addressing foreign language and deaf interpretation, that decisions regarding interpretive services are within the sound discretion of the trial court." *Id.* at 503. "A trial court should not be reversed absent a clear abuse of discretion, that is, only when his ruling lies outside the zone of reasonable disagreement." *Id.*; *see Balderas v. State*, 517 S.W.3d 756, 777 (Tex. Crim. App. 2016) ("[I]n considering challenges to the adequacy of interpretive services, this Court and other appellate courts have deferred to the wide discretion of the trial judge, who had direct contact with the witness, the parties, and the interpreter, to make decisions.").

This Court's December 31, 2024 opinion starts the analysis from these legal principles, and we adhere to those principles today. *See Tolentino III*, 2024 WL 5249165, at *2. We add only a note about how abuse of discretion review operates when parties clash over matters of fact. Generally speaking, an abuse of discretion does not occur when the evidence is conflicting: "if the evidence can be said to be conflicting, we will not say that there has been an abuse of discretion." *Chambers v. State*, 903 S.W.2d 21, 28 (Tex. Crim. App. 1995); *see also Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000) ("[W]here there is conflicting evidence

8

there is no abuse of discretion if the motion is overruled."); *Gardner v. State*, 306 S.W.3d 274, 301 (Tex. Crim. App. 2009) ("[I]f the evidence is conflicting, the trial judge does not abuse his discretion by finding either that the veniremember is or is not disqualified.").

Given the agreed-upon standard of review, it remains to examine the evidence. The trial court had several kinds of evidence before it when it ruled on the motion for new trial. Four categories of evidence stand out as the most critical:

- An affidavit from Tolentino;

- An affidavit from Jacqueline Yii, an administrative assistant in the Harris County Public Defender's office;

- Testimony from Irma Zavala, an interpreter from the trial; and

- The testimony and video evidence from the key police officer at the scene, Detective Arturo Nerio.

Although testimony also came from a second interpreter (Toni Rideout), she did not recall the proceedings and could not cast any light on the key issue.[1]

For completeness, we note that the trial court also could have considered some contextual evidence, such as the nature of the trial itself.[2] The Court of Criminal

---

[1] When asked by the State whether she had "any memory of any time in the last few months where someone indicated to you that they didn't understand what you were translating to them in Spanish," Rideout responded, "No, I don't." She then stated, "I have no memory of it. I don't remember that happening at all. I think I would remember someone saying, I didn't understand."

[2] As evidence in support of his motion for new trial, Tolentino also attached an excerpt from the trial record that contained his objection to proceeding with a Spanish interpreter rather than a Nahuatl interpreter. Defense counsel stated that

Appeals made this point in *Linton* when listing facts that the trial court could have consider there as part of the calculus: "We add to that list [of facts]: This was not a complicated case, it was a simple DWI trial. The level of linguistic competency necessary to participate in one's defense is directly related to the complexity, both factually and legally, of the case." 275 S.W.3d at 505. That said, the most significant categories of evidence are the four ones just mentioned.

**Tolentino's affidavit.** First, there is the affidavit from Tolentino. It takes the position that he understands less than 50% of the Spanish he hears:

> I am Sostenes Tolentino, the Defendant in this case. I was charged with driving while intoxicated. My attorney was Matthew Perez.
>
> I was born in Mexico but only speak and understand Spanish a little bit. In my hometown everyone speaks Nahuatl. Once we start school we start to learn Spanish. However I only was in school for about 5 years and did not become good at Spanish. I would say I understand less than 50% of the Spanish I hear spoken.
>
> My attorney knew prior to trial that I did not understand Spanish very well. He told me to use my native language when in court. He asked for an interpreter, but he did not ask the court for a Nahuatl interpreter, he asked for a Spanish one. I did not understand what was being said or what was happening during trial.

---

Tolentino has a "general understanding of the [Spanish] language with there being some phrases and/or words that he is not able to understand," but his "primary communications whenever we first were hired were through his brother who has a little bit more of understanding of Spanish than Mr. Tolentino." Counsel argued that proceeding with a Spanish interpreter when there are "legal, technical terms that he may not understand, that there may not be a word for [in Nahuatl], goes against his rights." The State relied on Detective Nerio's testimony from the suppression hearing and the video of Nerio's encounter with Tolentino to argue that Tolentino had a sufficient understanding of Spanish to proceed with a Spanish interpreter.

This document was translated to me by an interpreter in my native Nahuatl language.

Tolentino did not take the stand at the motion for new trial hearing.

**Yii's affidavit.** Second, there is the affidavit from Yii. She stated that she had difficulty communicating with Tolentino because of his limited command of Spanish:

> I am JACQUELINE YII, and I am an Administrative Assistant at the Harris County Public Defender's Office. When Scott Pope was appointed to represent Sostenes Tolentino on appeal our office was informed that Mr. Tolentino was a Spanish speaker. I accompanied Mr. Pope to court to translate so we could interview Mr. Tolentino to determine if there were grounds to file a Motion for New Trial. Spanish is my first language.

> We first met at the court and then moved the meeting to the Public Defender's Office on the 13th floor so that we could have privacy. At that meeting, I had difficulty translating to Mr. Tolentino what Mr. Pope was saying. Mr. Tolentino would nod like he understood, but I was not sure he really did understand. Mr. Tolentino can speak and understand some Spanish but his vocabulary is very limited and basic. I would say it is on the level of what a five year old child would understand. Immediately after Mr. Tolentino left, I told Mr. Pope I did not believe Mr. Tolentino understood the questions we were asking him or anything much beyond who we were and that we were going to try to help him.

> We started looking for an interpreter who spoke Nahuatl. We were able to find someone to translate within 24 hours by contacting Masterword. We set up a second meeting to speak with Mr. Tolentino. At that meeting, Mr. Tolentino told us through the interpreter he did not understand much of anything from the first meeting he had with Mr. Pope. The attorneys had to [go] over everything again to make sure he understood what we were doing and why.

11

There was a big difference between the two attorney interviews. At the second interview, Mr. Tolentino actually asked questions instead of just looking at me with a blank stare. He also spoke in paragraphs instead of just "yes" or "no". It appeared to me Mr. Tolentino and the interpreter were having actual detailed conversations. At the end of the meeting, I translated Mr. Tolentino's affidavit to the interpreter who then translated it [to] Mr. Tolentino before he signed it.

Again, Yii did not take the witness stand.

**The interpreter's testimony.** Third, there is the live testimony from Zavala. She took the stand at the motion for new trial hearing and was examined by both sides. The direct examination went as follows:

Q.  When you first met the defendant, did you have sort of an introductory conversation with him?

A.  I always do.

Q.  Was that in Spanish?

A.  Yes.

Q.  At that time did he indicate to you at all that he was having trouble understanding what you were saying to him in Spanish?

A.  No.

Q.  During the trial did he ever indicate to you that he was having trouble understanding what you were saying in Spanish?

A.  No.

Q.  Did you ever ask him, like, if he understood specifically what you were telling him?

A.  I always ask the defendant or the person that I'm working for if they're—they understand what is going—what I'm saying. Do you understand me? Do you understand what is being said? Do

12

you need any further explanation or—so I can help you with it, so you can understand?

Q. And what were his responses to those questions?

A. (speaking Spanish.)

Q. And what does that mean in English?

A. Everything's fine. Everything's fine. Thank you.

Q. During the whole time you were translating for him during that trial, did he ever indicate to you that he was having trouble understanding anything that was happening—

A. No.

Q. —during the trial? Say that again, I'm sorry?

A. No.

The cross-examination spans fewer pages. It produced the following exchanges with

defense counsel:

Q. It was a DWI trial, do you remember that?

A. Yes.

Q. And in a DWI trial such as this one, there are certain things that were talked about, such as field sobriety tests?

A. Uh-huh.

Q. And did you ask him if he understood, like, what field sobriety tests are?

A. No, because that's not what I'm here to ask him. I am only here to interpret what's being said.

Q. So if there is a legal term such as BAC or blood alcohol content, you can't explain what that concept is to him, correct?

A. No, sir, because that is not what I'm here for.

13

Q. And so when he is telling you that he understands what is being said, that doesn't necessarily mean, in your opinion, that he understands all of the legal issues that are going on in the case?

[The State]: Objection, speculation.

The Court: Rephrase that question.

Q. Would it be true that you can't testify that he understood all of the legal aspects of the case, that you can only testify as to what is exactly being said? Is that true?

A. Yes, sir, but—

[The State]: Speculation, Your Honor.

The Court: That's overruled. You can answer.

A. Yes, sir, but I believe that his attorney would have explained all of that to him beforehand.

Q. But you have no knowledge that the attorney explained that to him at all, is that true?

A. No, because I don't work for the attorney.

At the end of the new trial hearing, the trial court floated the possibility of bringing a Nahuatl interpreter so that Tolentino himself could testify. For some reason, however, that never took place:

The Court: Okay. And you're choosing not to put Mr. Tolentino on to answer questions right now. Is that because there is no Nahuatl interpreter?

[Defense]: That is exactly because there is no Nahuatl interpreter.

The Court: I can get one at 1:30.

[Defense]: We could do that if you choose.

14

The Court:  All right. Based on the record as it exists now, I'm going to deny the Motion For New Trial.

Thus, the hearing adjourned without any further testimony.

**Detective Nerio's testimony and video.** Fourth, and finally, there remains the evidence from Detective Nerio and the video from his body camera. Detective Nerio testified at a pretrial hearing on Tolentino's motion to suppress. Although the court watched some of the video during the hearing, the court also heard the following testimony from Detective Nerio:

Q.  And, Officer, to clarify, was it clear to you that the defendant could understand what you were saying?

A.  Oh, yes, we were having full conversations.

. . . .

Q.  Okay. And at the 58:41 mark where there is alleged admission of driving, what did Mr. Tolentino say, exactly? Even if it is in Spanish, what did he say?

A.  I would have to replay the video to recall.

Q.  Okay. I believe he said, manejo bien?

A.  Oh, yes.

Q.  What does that—what does that mean?

A.  Drive well.

Q.  Drive well. That doesn't mean, I was driving well? Correct?

A.  Yes.

Detective Nerio also took the stand at trial. He testified that he went to the scene to assist with another DWI investigation, and that he "noticed" Tolentino

15

approach the scene. He stated, "And basically, at that point, since we're so used to having crowds mostly gather during most of our scenes, as long as he maintained his distance, I don't have a problem with that. So that's where, at that point, he had stopped, so I continued on with assisting of the officer."

But Nerio felt that in the course of the encounter with the other suspects, Tolentino had come "too close to our current—our current investigation." Tolentino "had staggered walk. As he was responding to me giving him command to step back, he had slurred—he sounded slurred in his speech." Nerio then approached Tolentino "once [Nerio] was notified by someone else on the scene that [Tolentino] looked like he was walking back towards the truck to get into the truck." When asked why he approached Tolentino at that time, Nerio responded: "At this point I have reasonable suspicion that he was intoxicated, and it appeared that he was about to get back into the vehicle and drive off."

Detective Nerio also testified about taking Tolentino to the police station for sobriety tests. The video of that episode lacks audio, but Nerio testified that they were able to communicate with each other in Spanish:

Q. Okay. Now when the defendant is supposed to perform these tests, how is it explained to him?

A. Mainly they're explained and demonstrated.

Q. Okay. So he is given instructions?

A. Yes.

Q.     And how do you give instructions to the defendant?

A.     Mainly the DWI technician at the JPC Center gave him the instructions in English, I translated for him in Spanish.

. . . .

Q.     Did he—did the defendant perform the test based on the instructions given?

. . . .

A.     Yes, he did.

On cross-examination, Nerio again testified about speaking with Tolentino in Spanish:

Q.     Now, Detective, when you encountered Mr. Tolentino when you put him in handcuffs, you testified earlier that in Spanish you said, You're about to start driving; is that correct?

A.     Yes.

Q.     And you said, You're about to start driving, because, in fact, you had not observed him driving previously?

A.     Incorrect.

Q.     Now, did you communicate with Mr. Tolentino in any other language?

A.     No, I did not.

Q.     Are you aware that Mr. Tolentino's native language is not Spanish?

A.     Due to the fact that he was having full conversations with me in Spanish, I did not believe that he needed a different dialect.

Crucially, there is also the video from Detective Nerio's body camera, taken in the field where he and Tolentino encountered each other. The video runs about 63 minutes. The first 51 minutes of the video deal purely with Nerio's interactions with

17

other individuals at the scene. One of Nerio's colleagues had detained two individuals for possible DWI and asked Nerio to assist in communicating with them in Spanish. But by about the 52-minute mark, the officers noticed Tolentino standing nearby, next to his own vehicle.

What then took place can be seen on the video, but this opinion cannot fully capture the sounds and sights of the midnight scene, which took place in the parking lot near the Club Creek Washateria. This Court described these matters with a summary in its December 31, 2024 opinion, albeit without undertaking to transcribe the exchange. *Tolentino III*, 2024 WL 5249165, at *3. Taking issue with the Court's summary, the State's rehearing motion described matters very differently and offered an unofficial transcription of much of what Nerio and Tolentino said to each other. According to the rehearing motion, the first interaction unfolded as follows:

> 52:55-56:14: Nerio shouts "stop" ("pare!") at appellant from a distance. As Nerio gets closer he says, "What are you doing?" ("que estas haciendo?") and "why did you come here ("porque vino aca?"). Appellant says "nothing" or "no reason" ("por nada"). Nerio asks appellant why he came over there and appellant says he had no reason to be there ("por nada."). Nerio asks a series of fast-paced compound questions and appellant doesn't respond. Nerio asks where appellant lives, and appellant says he lives here—he points in a direction. His words at this point are hard to make out in part because of slurring. Nerio handcuffs appellant, who keeps repeating that he didn't do anything. ("No hago nada" and "no estoy haciendo nada," and "no estoy haciendo nada, mijo"). When Nerio instructs appellant to sit down in the police cruiser ("toma siento"), appellant asks how ("como, como no puedo"). Nerio asks why appellant can't sit down ("porque no puedes"), and appellant responds by saying there was a problem with his hands. As appellant struggles to get in the police SUV Nerio keeps telling him

18

to sit down ("sientate") and appellant keeps repeating "pero porque"—but why? When he finally gets in, he says "pero porque, no hago nada"—but why, I didn't do anything. As Nerio walks away, appellant says he's not doing anything and changes his term for Nerio from "mijo" to the more respectful "senor"—"no estoy haciendo nada, senor."

In a footnote, the rehearing motion then offers its version of part of the encounter in question-and-answer form:

(Nerio approaches appellant, who is now standing near his truck):

Nerio:       Hey! Hey! Pare. ("Stop.").

Nerio:       ¿Que estas haciendo? ("What are you doing?")

Appellant:   ¿Que? ("What?")

Nerio:       ¿Que estas haciendo? ("What are you doing?")

Appellant:   Nada. ("Nothing").

Nerio:       ¿Que estas haciendo? ("What are you doing?")

Appellant:   Nada. ("Nothing").

Nerio:       Nada. ("Nothing.").

Nerio:       ¿Porque vino paca? ("Why did you come here?").

Appellant:   ¿Ah?

Nerio:       ¿Porque vino paca? ("Why did you come here?").

Appellant:   No…no…no…

Nerio:       ¿Porque vino? ("Why did you come?").

Appellant:   Eh?

Nerio:       ¿Porque vino paca? ("Why did you come here?").

Appellant:   Por nada. ("No reason").

Nerio:       ¿Por nada? ("No reason?" to which appellant shakes his head "no" in response).

Nerio:      ¿Y que? ¿Orinado, intoxificado, y va a empezar a manejar? ("And what? Urinated, intoxicated, and are you going to start driving?").

Appellant:  No, no, no. (Pointing past Nerio towards something).

Nerio:      ¿Que-que-que-que-que-que-que no responsinando que afuera, aqui arriba? ("What-what-what-what-what-what-what isn't responding outside–up here?" said as Nerio's shadow shows he is spinning his hand next to his head).

Appellant:  (Stares, then looks away). No hay nada. ("There's nothing.").

Nerio:      ¿Donde vive? (repeated, "Where do you live?").

Appellant:  ¿Eh? Aqui vivo. ("Huh? I live here", said as he points behind Nerio as before).

Nerio:      ¿En donde? ("In where?").

Appellant:  Aqui en su [unintelligible/slurred speech]. ("Here in your . . ." while pointing in the same direction).

(Nerio walks past appellant, says "fucker," and turns around to start hand-cuffing appellant).

Nerio:      A la puerta. ("To the door").

Nerio:      Mano. Manos, su manos, su manos. ("Hand. Hands, your hands, your hands[.]").

Appellant:  No, no se. ("No, I don't know," in response to female officer asking "Why? Por que . . . ?")

Appellant:  No. No hago nada. No hago nada. ("No. I don't do anything. I don't do anything.").

Nerio:      Uh-huh. Other than you pissed yourself, and you were about to get into a fucking car, you didn't do shit. (as appellant continues to say, "No, no.").

Appellant:  No hago nada. ("I don't do anything.").

Nerio:      Oh, you didn't do nothing? Okay.

Appellant:   Y no haciendo nada. ("And I'm not doing nothing.").

Appellant:   Y no estoy haciendo nada hay. ("And I'm not doing anything there.").

Nerio:   Aca…get up. ("Here").

Appellant:   Y no estoy aqui, no hago nada. ("And I'm not here, I don't do anything.").

. . . .

Appellant:   No estoy haciendo nada, mijo. ("I'm not doing anything, son").

Nerio:   Tome siento. ("Take a seat").

Appellant:   ¿Que? ¿Como, como? ("What? How, how?").

Nerio:   Tome siento. ("Take a seat.").

Appellant:   No puedo. ("I can't").

Nerio:   ¿Porque no puede? ("Why can't it?").

Appellant:   Tengo un [unintelligible] con los manos y . . . . ("I have a . . . with the hands and . . .").

Nerio:   ¿Porque? ¿No puedo su viso pae—no puedo su viso—su pierna, su pierna alli? ("Why? Can't I see you—can't I see your—your leg, your leg here?").

Appellant:   No…

Nerio:   Se va. Se va. Meta su pie. ("He goes. He goes. Put your foot.").

Nerio:   ¿Mande? Sientate. ("What? Sit down.").

Appellant:   ¿Pero por que? ("But why?").

Nerio:   Sientate sir. ("Sit down sir.").

Nerio:   Meta sus pies. Ganas. ("Put your feet. Reach.").

Appellant:   ¿Pero por que? ("But why?")

| | |
|---|---|
| Nerio: | Anda va. Alli esta. Alli esta. Se va. Se va hace. ("Come on. There it is. There it is. He goes. He goes ago."). |
| Appellant: | ¿Pero por que? ("But why?"). |

Although the rehearing motion's transcription is unofficial, and although we do not endorse the accuracy of every word of it or of the translation, it conveys a sense of the communication between Nerio and Tolentino in the parking lot that night.

After Tolentino took a seat in the back of the patrol car, the two men had another conversation in Spanish. When Nerio asked him where he had come from ("de donde venia?"), Tolentino responded, "de un bar." When Nerio then asked how many drinks he had had to drink, Tolentino responded, "tomé tres."

In light of the exchanges about where Tolentino lived, where he was coming from, and how many drinks he had to drink, there is no doubt that Nerio and Tolentino communicated with each other in Spanish. At the same time, it is also clear that their interactions fell far short of smooth, nuanced, and effortless conversation. The challenge on appeal is to decide whether the trial court abused its discretion.

## III.

Under *Linton*, constitutional due process "requires that a defendant sufficiently understand the proceedings against him such that he is able to assist in his own defense." 275 S.W.3d at 504.

If the question is whether the trial court had any evidence before it to show that Tolentino could understand some Spanish, the answer would have to be yes. Tolentino plainly understood some of Nerio's questions and plainly answered them in Spanish. Moreover, the interpreter, Zavala, testified that "I always ask the defendant or the person that I'm working for if they're—they understand what is going—what I'm saying. Do you understand me? Do you understand what is being said? Do you need any further explanation or—so I can help you with it, so you can understand?" According to Zavala, Tolentino responded that everything was fine and thanked her. That testimony went directly to the issue of his understanding. When coupled with Detective Nerio's testimony and the back and forth on the videotape in Spanish (*e.g.*, Where were you coming from? From a bar, etc.), Zavala's testimony would surely seem to have provided the trial court with a factual foundation for concluding that Tolentino could understand the proceedings.

Accordingly, if we apply classic abuse of discretion review and leave room for the trial court to resolve conflicts in the evidence, we perceive conflicts in the evidence about whether Tolentino could understand enough Spanish for "a simple DWI trial," *see id.* at 505, and see no abuse of discretion. *See Chambers*, 903 S.W.2d at 28 ("[I]f the evidence can be said to be conflicting, we will not say that there has been an abuse of discretion.").

This conclusion gives us genuine pause. There are moments on the video where Tolentino fails to respond, displays puzzlement, and seems not to grasp what is being done and said. The Spanish conversation between him and Detective Nerio takes place at a relatively basic level. The trial court could easily have gone the other way and found that Tolentino needed a Nahuatl interpreter. But the court also could have found that the communication difficulties came more from Tolentino's intoxication than from language limitations.[3]

Should the trial court have done more by fleshing out additional details about Tolentino's abilities? Possibly. The opinion in *Linton* approvingly quotes from a Seventh Circuit case for the proposition that due process is denied when "a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact."[4] 275 S.W.3d at 505 (quoting *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985)).

---

[3]  At trial, the forensic technical supervisor for the Intoxilyzer machine used in this case testified that the alcohol concentration in Tolentino's breath sample was .203 grams per 210 liters, more than twice the legal limit of .08.

[4]  A defendant is also denied due process when (1) what is told to him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; or (3) the nature of the proceeding is not explained to him in a manner designed to ensure his full comprehension. *Linton v. State*, 275 S.W.3d 493, 505 (Tex. Crim. App. 2009) (quoting *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985)).

Here Tolentino made a very credible claim of incapacity, and the trial court provided no findings of fact whatsoever. If the law requires further findings from the trial court, Tolentino would be entitled to receive those findings so that an appellate court can review them. Or if the law is that Tolentino's credible claim of incapacity shifted the burden to the State to come forward with additional evidence, Tolentino would be entitled to relief on that basis.

But those kinds of innovations in the law would be better left to a court of last resort and not from an intermediate court of appeals. If *Linton* requires more than what was afforded here, or if it creates a burden-shifting scheme that required something more from the State, we believe that such a holding should originate with the Court of Criminal Appeals and not with this Court.

We grant the State's motion for rehearing and affirm the judgment of conviction.[5]


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Publish. TEX. R. APP. P. 47.2(b).

---

[5] We withdraw our opinion and judgment dated December 31, 2024. Because we issue a new panel opinion, the State's request for en banc reconsideration is moot. *See Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 n.4 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ("If the panel grants rehearing, however, as occurred here twice previously, then the 'Motion for Rehearing En Banc' is rendered moot."). All other pending motions are dismissed as moot.